Filed 8/7/26  P. v. McDonald CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY CHASE MCDONALD,<br>    Defendant and Appellant. | C101987<br><br>(Super. Ct. No.<br>SCCRCRF202029) |

Defendant Timothy Chase McDonald murdered Spencer Hodgson.  He drove to Hodgson's house, parked a short distance down the road, and waited for him to return home.  He then knocked on the front door and pretended to have a flat tire.  Hodgson agreed to drive defendant to his truck and help him change the tire.  During the drive, in the opposite direction from where his truck was parked, defendant pulled out a .44-caliber revolver and shot Hodgson several times.  Hodgson's truck veered across the roadway and crashed into an embankment.  Defendant pulled Hodgson out of the truck and dragged his body down a muddy roadside ravine.  He then got back into Hodgson's truck, drove it into a creek bed a few miles away, and walked back to where he parked his truck.  The reason for the violence was jealous animosity.  Defendant's girlfriend was in the process of ending their relationship and beginning a new one with Hodgson.

A jury found defendant guilty of first degree murder (count 1) and found that the murder was committed by means of lying in wait and that defendant personally and

intentionally discharged a firearm causing death. Based on a separate incident, the jury found defendant guilty of carrying a concealed, loaded, and unregistered firearm in a vehicle (count 2) and armed criminal action (carrying a loaded firearm with the intent to commit a felony) (count 3). The trial court sentenced defendant to state prison for life without the possibility of parole (LWOP), plus 25 years to life, plus two years eight months.

Defendant now contends (1) we must reverse the lying-in-wait special-circumstance finding because there is insufficient evidence Hodgson was ambushed in a surprise attack; (2) we must also reverse defendant's count 3 conviction for armed criminal action because the evidence is insufficient to support a finding that he intended to commit a felony when he carried the loaded firearm; (3) the trial court incorrectly instructed the jury on the intent required for the count 3 charge of armed criminal action; (4) the trial court should have stayed the sentence imposed for either the count 2 conviction for carrying a concealed, loaded, and unregistered firearm in a vehicle, or the count 3 conviction for armed criminal action; and (5) the trial court erred by failing to dismiss the firearm enhancement.

We conclude the evidence is sufficient to establish that defendant murdered Hodgson by means of lying in wait. The evidence also supports defendant's conviction for armed criminal action. In addition, defendant's instructional error contention lacks merit. However, as the People concede, the trial court should have stayed the sentence imposed for either the count 2 conviction for carrying a concealed, loaded, and unregistered firearm in a vehicle, or the count 3 conviction for armed criminal action. We will affirm defendant's convictions, vacate the sentence, and remand the matter for a full resentencing hearing. For the purposes of providing guidance on remand, we will also conclude that defendant's firearm enhancement contention lacks merit.

2

BACKGROUND

Defendant and G.M. began dating in high school. During the relationship defendant became jealous and periodically angry, and he engaged in controlling and verbally abusive behavior. Defendant often accused G.M. of cheating on him. G.M. said defendant wanted to know whenever she spoke to another man.

In April 2019, G.M. flew to Las Vegas for her sister's baby shower. She flew there with her mother and her sister's friend on Thursday, April 4, and flew home on Sunday, April 7. At the time, she and defendant were taking a break from their relationship but continued talking. G.M. told her sister and her sister's friend about a new man she was interested in dating, Hodgson.

G.M. worked at a feed store in Yreka. Hodgson was a regular customer. G.M. started spending time with Hodgson during her lunch breaks, and they flirted with each other through Instagram.

Defendant knew about Hodgson. He found out when he looked through G.M.'s cell phone and saw some of Hodgson's Instagram messages. Defendant called and texted G.M. "over and over" while she was in Las Vegas. She ignored many of his calls and texts. When she answered one of his calls, he sounded like he was crying and threatened to kill himself. During another conversation, defendant told G.M. that he was going to find Hodgson's house and "beat him up" or "kick his ass." He later sent her a text message saying, "I figured out where your little boyfriend live[s] and I'm sitting outside his house right now."

Hodgson lived on Walker Road in Klamath River. On April 7, 2019, he went to a community fundraiser not far from his house. At around 6:00 or 7:00 p.m., two attendees drove past Hodgson's house on their way to retrieve a forgotten item. A black truck matching the description of defendant's truck was parked at the edge of Hodgson's property near a logging machine. It was still there when they returned to the fundraiser a short time later. Another attendee, C.S., saw the same truck a short time later and

3

identified it as defendant's truck.  C.S. saw defendant's truck parked at the convergence of Walker Road and Barkhouse Road, about a mile from Hodgson's house.

R.W. lived about 100 yards from Hodgson's house.  Sometime around 8:00 p.m., defendant knocked on her door and said his truck broke down.  He told her that someone had given him a ride to a phone and his brother was on his way from Yreka, but he needed a ride back to his truck to wait for him.  Because it was raining and getting dark out, and he reminded her of one of her sons, R.W. gave defendant a ride to his truck, which was still parked where C.S. had seen it about an hour earlier.

Defendant moved his truck to the other side of Hodgson's house, next to a corral near Walker Bridge.  One of the fundraiser attendees who saw it parked at the edge of Hodgson's property earlier in the night spotted it at this new location at around 10:00 p.m. and again after midnight.  He thought it was " 'very odd' that the same truck was parked in two different locations that evening."

By 8:20 p.m., Hodgson was home and played an online video game until around 9:30 p.m.  Sometime after that, defendant knocked on his door.  Defendant later admitted that he had knocked on Hodgson's door earlier that night, but he was not home, so defendant "waited him out" and knocked again after he got home.  Defendant told Hodgson that he had a flat tire about a quarter mile down the road and asked for help changing his tire.  Hodgson agreed to give defendant a ride and told him to grab a jack that was near the front door.  Defendant grabbed the jack and the two headed to Hodgson's truck.  Defendant directed Hodgson to drive in the opposite direction of where his truck was parked.

At some point while Hodgson was driving down a remote stretch of Yreka Walker Road a few miles from his house, defendant pulled out a .44-caliber revolver and shot Hodgson multiple times.  Glass from Hodgson's driver's side window was found in the roadway and confirmed that at least the first shot was fired while the truck was driving down the road.  From there, tire tracks led to an impact depression in an embankment.

4

The parties stipulated that Hodgson's truck veered across the roadway and crashed into the embankment.

Defendant got out of the truck, pulled Hodgson out, and dragged his body down a muddy roadside ravine. Defendant got back in the truck, backed it out of the embankment, and drove away. Defendant drove Hodgson's truck about a mile further down Yreka Walker Road. He then went off road and drove the truck about 20 feet down a different ravine and into a creek bed. After wiping down the truck, defendant walked about five miles back to his truck. Hodgson's autopsy revealed that he died from several gunshot wounds. Defendant had obtained a Ruger Super Blackhawk .44 Magnum revolver from his father less than two months before the murder.

The prosecution also adduced testimony regarding a separate incident that gave rise to the count 2 charge of carrying a concealed, loaded, and unregistered firearm in a vehicle, and the count 3 charge of armed criminal action. In July 2018, defendant got into a physical altercation with Kenneth and Ronald Reed. Defendant was angry that Kenneth had driven G.M. off the road about a week earlier. He decided to go to the Reed house with his friend Caleb Pierce and his coworker Scott Sutton to beat Kenneth's ass or "fuck him up." Pierce drove defendant and Sutton to the Reed house and parked two houses away. Defendant brought a handgun, but left it in Pierce's truck, saying "in case anything happens we won't be the ones in trouble for using it." Defendant and Pierce walked over to the Reed house. Sutton stayed in the truck. At the house, defendant got into a heated argument with both Kenneth and Ronald. Kenneth pulled out a rifle. Ronald displayed a knife and pushed defendant against a wall. Seeing the altercation unfold, Sutton grabbed defendant's handgun and ran over. He pointed the gun at Kenneth and told him to drop the rifle. Kenneth ran inside the house. Sutton gave the gun to defendant, who put it in his waistband. Ronald got in defendant's face. Defendant punched him, knocking him into a rose bush.

5

Defendant, Pierce, and Sutton left the Reed house and were pulled over a short time later.  When Pierce gave deputies consent to search the truck, defendant admitted the handgun in the center console was his.  The gun was loaded and defendant was not the registered owner.

## DISCUSSION

## I

Defendant claims the evidence is insufficient to support the lying-in-wait special-circumstance finding.

"In reviewing the sufficiency of the evidence for a special circumstance, as for a conviction, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt."  (*People v. Dickey* (2005) 35 Cal.4th 884, 903; *People v. Stevens* (2007) 41 Cal.4th 182, 201.)

Penal Code[1] section 190.2, subdivision (a)(15) sets forth a penalty of death or LWOP for first degree murder where "[t]he defendant intentionally killed the victim by means of lying in wait."  This lying-in-wait special circumstance requires that the defendant (1) intended to kill the victim, (2) concealed that purpose from the victim, (3) engaged in a substantial period of watching and waiting for an opportune time to act, and (4) carried out a surprise attack on the unsuspecting victim from a position of advantage.  (*People v. Parker* (2022) 13 Cal.5th 1, 58 (*Parker*).)  The second and fourth elements overlap in the sense that the concealment of purpose required " ' "is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise." ' [Citation.]"  (*People v. Johnson* (2016) 62 Cal.4th 600, 632 (*Johnson*).)  Although the

---

[1]  Undesignated statutory references are to the Penal Code.

period of watching and waiting required to satisfy the third element must be "substantial," the amount of time is " 'not critical.' " (*People v. Moon* (2005) 37 Cal.4th 1, 23.) All that is required is enough time " 'to show a state of mind equivalent to premeditation or deliberation.' [Citation.]" (*Ibid.*)

Defendant only challenges the sufficiency of the evidence supporting the fourth element -- that he carried out a surprise attack on an unsuspecting victim from a position of advantage -- arguing that because "the record is silent about what happened after [Hodgson] entered the truck," the evidence does not support a finding that Hodgson "was suddenly ambushed in a surprise attack."

Defendant was upset about G.M.'s communications with Hodgson. He found out where Hodgson lived and drove to his house, bringing a loaded .44 Magnum revolver. He parked a short distance from Hodgson's house, moved his truck at least once, and waited for Hodgson to get home. Defendant concealed the revolver when he knocked on Hodgson's door and pretended to have a flat tire. Defendant then lured Hodgson down a rural stretch of road in the opposite direction from where his truck was parked before shooting him to death. The jury could have reasonably concluded that the ruse was designed to put defendant in a position of advantage, i.e., that of an armed passenger telling Hodgson where to drive, whereas Hodgson would be focused on driving and at a disadvantage when defendant decided to pull out the revolver and take him by surprise.

Although, as defendant points out, the record does not reveal exactly what happened in the truck immediately after Hodgson got inside, the physical evidence supports a reasonable inference that defendant fired on Hodgson while the truck was driving down Yreka Walker Road, causing the truck to veer across the roadway and into the embankment. This inference arises from the glass in the roadway, the tire marks leading to the embankment, the impact depression in the embankment from the front of Hodgson's truck, and the fact that the bullet strikes inside the truck indicate that Hodgson was shot from the passenger side of the vehicle.

7

*People v. Cage* (2015) 62 Cal.4th 256 (*Cage*) is instructive. There, the defendant physically and emotionally abused his wife, Clari, who eventually left him with the help of her mother, Bruni. (*Id*. at p. 263.) The defendant knocked on Bruni's door holding a laundry basket containing his and Clari's clothes. Hidden in the basket was a loaded shotgun. Bruni allowed the defendant to come inside. They spoke for a few minutes. The defendant then removed the shotgun from the basket, shot her to death, and went upstairs, where he also shot and killed her son, David. (*Id*. at p. 279.) Concluding the evidence was sufficient to support the jury's lying-in-wait special-circumstance finding, the California Supreme Court explained: "A jury could rationally deduce from these facts that defendant planned and undertook a deliberate subterfuge aimed at making his presence appear to be an innocuous offer to return Clari's clothes or request to do laundry so that Bruni would open the door and admit him. The ruse disguised his intent to kill." (*Ibid*.) With respect to watchful waiting, the court concluded that the few minutes the defendant spent talking to Bruni before shooting her sufficed to show "a state of mind equivalent to premeditation or deliberation." (*Ibid*.) The court added: "It is also apparent from the record that defendant's surprise attack on Bruni and David followed in a continuous flow of events upon defendant's successful use of his ruse to persuade Bruni to open her front door. The jury could reasonably determine that defendant's actions met the requirement of an immediate surprise attack on unsuspecting victims from a position of advantage." (*Id*. at p. 280.)

Here, the jury could have reasonably concluded that defendant engaged in a subterfuge by knocking on Hodgson's door and pretending to have a flat tire, while concealing his loaded .44 Magnum revolver. The ruse hid his intent to kill by making his presence at Hodgson's doorstep appear to be innocent. Defendant's period of watchful waiting was much longer than the few minutes in *Cage*. And defendant's act of shooting Hodgson flowed directly from his successful ruse to persuade Hodgson to drive him to his purportedly incapacitated truck. Just as pulling a shotgun out of a basket to shoot an

8

unsuspecting woman in her home amounted to a surprise attack, the jury in this case could have reasonably concluded that defendant pulled his revolver on an unsuspecting Hodgson and opened fire.[2]

Nevertheless, defendant posits a number of scenarios that he claims are inconsistent with a surprise attack. For example, defendant argues, "Hodgson could have realized [defendant's] flat-tire story was a ruse and confronted him about it, leading to an argument, physical struggle, and car crash before the shooting." However, "[w]e need not credit defendant's contrary claims … because sufficient evidence supports the [jury's] conclusions." (*Parker, supra*, 13 Cal.5th at p. 60.) Moreover, the glass in the road supports an inference that at least the first shot was fired while the truck was in the roadway before the crash. Even if Hodgson became suspicious and confronted defendant before he opened fire, defendant still shot him from a position of advantage that was made possible by the ruse. And this posited scenario also does not necessarily negate the otherwise reasonable inference that Hodgson was taken by surprise. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 501 [lying-in-wait special circumstance upheld where the defendant announced his intent—" 'I ought to kill you' "—before stabbing the victim].) The lying-in-wait special-circumstance finding is supported by substantial evidence.

_____

**2** We note that *Cage* applied a version of the lying-in-wait special circumstance that required the murder to have been committed " '*while* lying in wait,' " (*Cage, supra*, 62 Cal.4th at p. 278, quoting § 190.2, former subd. (a)(15).) As defendant acknowledges, the version of the special circumstance applicable to him required only that he killed Hodgson "by means of lying in wait." (§ 190.2, subd. (a)(15).) This change in the statutory language "eliminate[d] the temporal distinction between the special circumstance and lying-in-wait first degree murder." (*Johnson, supra*, 62 Cal.4th at p. 636.) Under the new formulation, although the elements remain the same, the killing itself need not have been committed *while* the defendant was lying in wait so long as the concealment of purpose, watchful waiting, and surprise attack provided the means by which defendant committed the murder. (See *Parker, supra*, 13 Cal.5th at pp. 59-60.)

Defendant also claims we must reverse his count 3 conviction for armed criminal action (carrying a loaded firearm with the intent to commit a felony) because the evidence is insufficient to support a finding that he intended to commit a felony when he carried the loaded firearm.

Section 25800, subdivision (a) provides: "Every person who carries a loaded firearm with the intent to commit a felony is guilty of armed criminal action." This section "punishes the passive or static act of carrying a firearm with the intent to commit a felony, and the offense is complete when the firearm is carried with that intent." (*People v. Stout* (2019) 38 Cal.App.5th 669, 676.) The People based the charge on the separate incident when defendant, Caleb Pierce, and Scott Sutton went to the home of Ronald and Kenneth Reed to beat Kenneth's ass or "fuck him up." Defendant brought a handgun and left it in Pierce's truck, but Sutton later brought the gun to defendant, who put it in his waistband and punched Ronald. The People's theory was that defendant, while armed with a loaded handgun, went to the Reed house in July 2018 with the intent to commit the following felonies: (1) assault by means of force likely to produce great bodily injury; and/or (2) battery causing serious bodily injury.

Defendant does not dispute that he was armed with a loaded handgun when he went to the Reed house that day. He also does not challenge the sufficiency of the evidence supporting a conclusion that he went there to commit an assault and/or battery. However, simple assault and simple battery are not felonies. Assault by means of force likely to produce great bodily injury is a felony. (§ 245, subd. (a)(4).) So is battery causing serious bodily injury. (§ 243, subd. (d).) Defendant challenges the sufficiency of the evidence supporting a conclusion that he went to the Reed house with the specific intent to commit either felony.

Where, as here, a defendant asserts a sufficiency of the evidence challenge to a conviction that is based on two legally valid theories, we must generally affirm if the

evidence is sufficient to support either theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.) Because the evidence is sufficient to support a conclusion that defendant went to the Reed house, while armed with a loaded firearm, with the intent to commit an assault by means of force likely to produce great bodily injury, we need not assess whether the evidence also supports a finding that he intended to commit a battery causing serious bodily injury.

Defendant was convicted of armed criminal action, not assault by means of force likely to produce great bodily injury. He argues that even though he could have been convicted of the latter crime without specifically intending to use force likely to produce great bodily injury, to be convicted of armed criminal action, he must have specifically intended to use such force. We agree.

As stated previously, armed criminal action requires (1) carrying a loaded firearm, (2) with the intent to commit a felony. (§ 25800, subd. (a).) Thus, in order to be convicted of the offense based on his intent to commit an assault by means of force likely to produce great bodily injury, defendant must have carried a loaded firearm with the specific intent to commit an assault by using force likely to produce great bodily injury.

The evidence shows that defendant was angry at Kenneth for driving G.M. off of the road. He went to the Reed house with Pierce and Sutton to "beat his ass" or "fuck him up." That statement supports a reasonable inference that defendant went to the Reed house with the intent to commit more than a simple misdemeanor assault. Even though defendant left his gun in the truck before walking over to the Reed house with Pierce, "[o]ne may be guilty of assault by means of force likely to produce great bodily injury though the attack is made by use of the hands. What force is likely to produce great bodily injury is a question of fact to be determined by the jury." (*People v. Pierre* (1960) 178 Cal.App.2d 585, 590-591.) Thus, even though defendant likely did not intend to commit an assault with a firearm when he arrived at the Reed house armed with the loaded firearm, the jury could have concluded that he nevertheless intended to assault

11

Kenneth with enough force to "fuck him up."  Whether that amount of force would also be likely produce "significant or substantial injury" (*People v. Brown* (2012) 210 Cal.App.4th 1, 7) was for the jury to decide.  Moreover, defendant used similar language in describing what he planned to do to Hodgson when he went over to his house.  Based on what defendant did to Hodgson, the jury could reasonably have concluded that he went to the Reed house with the intent not only to assault Kenneth, but to do so by means of force likely to cause significant injury.

### III

In addition, defendant contends the trial court incorrectly instructed the jury on the intent required for the count 3 charge of armed criminal action.  But he did not object to the instructions he now challenges on appeal.  "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.]  The question is whether the error resulted in a miscarriage of justice … . [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)  We conclude there was no error, much less a miscarriage of justice.

The trial court provided the jury with the standard instruction on the elements of armed criminal action in violation of section 25800:  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant carried a firearm;  [¶]  2. The defendant knew that he was carrying the firearm;  [¶]  3. When the defendant carried the firearm, he *intended* to commit Assault By Means of Force Likely to Cause Great Bodily Injury … and/or Battery with Serious Bodily Injury … ;  [¶]  4. The firearm was loaded;  [¶]  [and]  [¶]  5. The defendant knew that the firearm was loaded."  The jury was also instructed that this was a specific intent crime, and that the specific intent required was the intent to commit either of those felony offenses.  The instructions accurately set forth the elements of the crime, including the requisite specific intent. Defendant does not argue to the contrary.

12

The trial court then instructed the jury on the elements of assault by means of force likely to cause great bodily injury (a section 245(a)(4) offense) and battery with serious bodily injury (a section 243(d) offense), i.e., the crimes that defendant was alleged to have intended to commit while he carried the loaded firearm. We need not set forth those instructions in any detail. Defendant does not dispute that they correctly set forth the elements of those offenses. He argues that because they are general intent offenses, and the jury was so instructed, the jury would have been misled to believe "that the prosecutor satisfied his burden of proving [defendant] intended to commit a felony based on proof that he intended only a misdemeanor assault or battery." He rests this argument on the following language, contained in the instruction for the section 245(a)(4) offense and the section 243(d) offense: "Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage." The section 245(a)(4) instruction also stated: "The People are not required to prove that the defendant actually intended to use force against someone when he acted."

"We review a claim of instructional error de novo to ascertain whether the instruction accurately states the applicable law. [Citation.] In doing so, we consider the challenged instruction in the context of all the instructions given to the jury and the trial record. [Citations.] ' " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " ' [Citation.] We presume that jurors are capable of understanding and correlating the court's instructions and we further presume those instructions were followed by the jury. [Citations.]" (*People v. Pierce* (2025) 114 Cal.App.5th 508, 534.)

Here, the jury was correctly instructed that in order to be convicted of armed criminal action, defendant had to have possessed the specific intent to commit either the section 245(a)(4) offense or the section 243(d) offense when he carried the loaded

13

firearm. The jury was also correctly instructed regarding the elements of each of those offenses. Read together, any rational juror would have understood the instructions to require defendant to have possessed the specific intent to satisfy each element of the offenses. For example, as stated previously, the section 245(a)(4) offense requires both (1) an assault, and (2) the force used must be likely to produce great bodily injury. (*People v. Covino* (1980) 100 Cal.App.3d 660, 667.) Although it is a general intent offense, because the armed criminal action instruction required defendant to have specifically intended to commit the offense, the jury would have understood that defendant had to have specifically intended to use force likely to produce great bodily injury. This does not mean defendant had to have intended to inflict great bodily injury (*ibid.*), but only that he "act[ed] with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act." (*People v. Wyatt* (2010) 48 Cal.4th 776, 781.)

Similarly, the section 243(d) offense requires both (1) a battery, and (2) "the use of force or violence inflicted serious bodily injury on the other person." (*People v. Lewis* (2004) 120 Cal.App.4th 882, 887.) Although it is also a general intent offense, because the armed criminal action instruction required defendant to have specifically intended to commit the offense, the jury would also have understood that defendant had to have specifically intended to use force that would inflict serious bodily injury.

The jury was properly instructed on the specific intent required for conviction of armed criminal action. Notwithstanding the fact that the jury was also informed that the section 245(a)(4) and section 243(d) offenses were themselves general intent offenses, reading all of the instructions together, there is no reasonable likelihood that the jury understood the instructions to require only a general intent to commit a misdemeanor assault or battery.

14

## IV

Defendant further asserts that the trial court should have stayed the sentence imposed for either the count 2 conviction for carrying a concealed, loaded, and unregistered firearm in a vehicle, or the count 3 conviction for armed criminal action. The People agree.

"[S]ection 654, subdivision (a), prohibits 'punish[ment] under more than one provision' for any 'act or omission that is punishable in different ways by different provisions of law.' " (*People v. Corpening* (2016) 2 Cal.5th 307, 309.) That section "applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor. [Citation.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Perez* (1979) 23 Cal.3d 545, 551.)

Whether a defendant possessed a single intent and objective is a factual question subject to substantial evidence review on appeal. (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) However, where the facts are undisputed, whether section 654 precludes multiple punishment is a legal question, subject to de novo review. (*People v. Goode* (2015) 243 Cal.App.4th 484, 493.)

During closing argument, the prosecutor argued the count 2 and 3 crimes were based on the same act of carrying a loaded firearm in Pierce's truck when defendant went to the Reed house. After the jury found defendant guilty of both crimes, the trial court sentenced defendant to the middle term of two years on count 2 and eight months (one-third the middle term) on count 3. But as the People concede, "[b]ecause the physical act underlying both counts was the same, it 'cannot give rise to multiple punishment.' " According to the People, the evidence adduced at trial would support a finding that defendant also possessed the gun outside of Pierce's truck, when Sutton brought it to him

15

and defendant put it in his waistband prior to punching Ronald.  However, as the People concede, "to the extent counts 2 and 3 'involved multiple divisible acts of carrying a firearm that day, they were plainly part of one indivisible course of conduct, namely, [defendant's] single trip to and from the [Reed house] to confront the brothers.' "

We will therefore vacate defendant's sentence and remand the matter for a full resentencing hearing, during which the trial court shall exercise its discretion with respect to which sentence to stay under section 654.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Jones* (2022) 79 Cal.App.5th 37, 46.)

V

Defendant claims the trial court erred by failing to dismiss the firearm enhancement.  Although we need not address this claim of sentencing error given that we will remand for resentencing, for the purposes of providing guidance on remand, we conclude the claim lacks merit.

"Effective January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) added subdivision (c) to section 1385, providing in relevant part that 'the court shall dismiss an enhancement if it is in the furtherance of justice to do so.' (§ 1385, subd. (c)(1).)  Section 1385, subdivision (c)(2) further provides:  'In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  "Endanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*People v. Torres* (2025) 113 Cal.App.5th 88, 92 (*Torres*).)

As in *Torres*, defendant "contends only one mitigating circumstance enumerated in section 1385 applies, subdivision (c)(2)(C), which provides in relevant part:  'The

16

application of an enhancement could result in a sentence of over 20 years.' " (*Torres, supra*, 113 Cal.App.5th at p. 92.) However, also like *Torres*, defendant was sentenced well after the effective date of the new subdivision, and he "did not object or raise any issue under this subdivision in the trial court. Failure to do so forfeits the issue on appeal." (*Ibid*.)

In *Torres*, this court nevertheless addressed the defendant's claim on the merits notwithstanding the forfeiture, holding that section 1385, subdivision (c)(2)(C) did not apply because his sentence exceeded 20 years without the enhancement. This court explained that "subdivision (c)(2)(C) of section 1385 provides in relevant part, 'The application of an enhancement could result in a sentence of over 20 years.' A sentence exceeding 20 years could *result* from an enhancement where a sentence of that length arises as a consequence of the enhancement. [Citation.] Thus, the effect of applying the enhancement itself leads to a sentence exceeding 20 years. The word result denotes a causal relationship between the enhancement and a sentence exceeding 20 years. Accordingly, this subdivision concerns 'enhancements increasing [a] sentence above 20 years.' [Citation.] In this instance, the sentence already exceeded 20 years without any enhancement, so application of the firearm enhancement did not result in the effect addressed by this provision." (*Id*. at p. 93.)

*Torres* is directly on point. The trial court sentenced defendant to LWOP for special circumstance murder, plus 25 years to life for the firearm enhancement, plus two years eight months on counts 2 and 3. The sentence exceeded 20 years without the enhancement. And because "the enhancement itself does not 'result' in a sentence exceeding 20 years," section 1385, subdivision (c)(2)(C) does not apply. (*Torres, supra*, 113 Cal.App.5th at p. 93.)

Defendant disagrees with *Torres* and "encourages [this] court to reconsider that decision." Having considered his arguments, we decline to deviate from that holding.

17

DISPOSITION

Defendant's convictions are affirmed, the sentence is vacated, and the matter is remanded for a full resentencing hearing. Following resentencing, the trial court shall prepare a new abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


/S/
MAURO, J.

We concur:


/S/
EARL, P. J.


/S/
ROBIE, J.